IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
October 9, 2001 Session

# WILLS ELECTRIC COMPANY, INC. v. HASSAN MIRSAIDI, INDIVIDUALLY & D/B/A MIRSAIDI CONSTRUCTION COMPANY

Appeal from the Chancery Court for Davidson County
No. 99-3001-I    Irvin H. Kilcrease, Jr., Chancellor

No. M2000-02477-COA-R3-CV - Filed December 13, 2001

A general contractor withheld the final payment for work completed by his electrical subcontractor, and the subcontractor sued for breach of contract. The trial court awarded the subcontractor the contracted-for amount, as well as pre-judgment interest and consequential damages. We reverse the award of consequential damages. In all other respects, we affirm the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed in Part; Reversed in Part; and Remanded**

BEN H. CANTRELL, P.J., M.S., delivered the opinion of the court, in which WILLIAM B. CAIN and PATRICIA J. COTTRELL, JJ., joined.

Richard E. Norman, Jr., Nashville, Tennessee, for the appellant, Hassan Mirsaidi, Individually and d/b/a Mirsaidi Construction.

Joseph Y. Longmire, Jr. and C. Ronald Blanton, Hendersonville, Tennessee, for the appellee, Wills Electric Company, Inc.

## OPINION

### I. CONTRACTOR AND SUBCONTRACTOR

General contractor Hassan Mirsaidi of Mirsaidi Construction signed a contract with the Metropolitan Government of Nashville and Davidson County to renovate a branch library. The total value of the contract was over $1,000,000. On January 22, 1998, Mirsaidi Construction hired Wills Electric as its electrical subcontractor, "to furnish all material, equipment and perform all work necessary to complete the electrical system for Pruitt Library . . . ." The initial contract price was $97,300, with Mirsaidi required to make monthly progress payments to Wills. The final payment was due upon completion of the work. A $4,800 change order, to which the parties agreed on December 9, 1998, increased the total payout to $102,100.

The proof showed that the parties did not enjoy a harmonious relationship while the contract was being performed. Russell Wills, who performed and/or supervised all the work done by Wills Electric, claimed that Mirsaidi consistently short-changed him on his progress payments, making it difficult for him to pay all his labor and his suppliers. Mr. Wills' wife, Lyndi, the president of the company, claimed that Hassan Mirsaidi told her that he would not discuss the alleged shortages with her because he didn't have to talk to a woman. For his part, Mr. Mirsaidi claimed that he always paid the correct amount, and that any perceived discrepancy was due to the fact that he had assumed the responsibility of making direct payments to a prime supplier of electrical parts which had not agreed to extend credit to Wills Electric.

Despite these difficulties, Russell Wills completed the work on the contract in January of 1999, and Hassan Mirsaidi admitted the job was satisfactory. But the general contractor held back a final payment of $19,013, because Wills had not fully paid all his suppliers or obtained lien releases from them. For his part, Wills said he could not pay the suppliers until Mirsaidi made the final payment on the contract.

On February 3, 1999, Mr. Wills submitted a "final request for payment" to Mr. Mirsaidi. Payment was not forthcoming, and in a subsequent letter, Wills suggested that joint checks be made out to Wills Electric and to three vendors to whom money was still owed. This was still unsatisfactory to Mirsaidi, and on October 18, 1999, Wills filed a complaint for the unpaid contract amount.

Mirsaidi answered, admitting that he owed on the contract, but claiming that the exact amount could not be ascertained. The contractor also claimed that Wills had refused to accept a partial payment check made out jointly to the subcontractor and to two unpaid suppliers, and that Wills' failure to pay his suppliers and to obtain lien releases from them held up Mirsaidi's final payment from Metro. Wills subsequently filed a Motion for Judgment on the Pleadings, which was denied by the trial court.

Wills Electric was a new business, and Mirsaidi's refusal to make the final payment on the completed contract put it in a financial bind. In order to pay his creditors and remain in business, Wills borrowed $25,000 from the First Tennessee Bank. On May 11, 2000, Wills amended his complaint to add a consequential damages claim for the interest he had to pay on the loan.

The trial court conducted a hearing in this case on September 6, 2000. The court observed that the parties could have settled this case if Mirsaidi had simply paid the subcontractor what it admitted owing, and the subcontractor had used the money to pay off its suppliers and obtained the necessary releases. However, the question of pre-judgment interest and consequential damages remained at issue.

At the conclusion of the proof, the court ruled that Mirsaidi was guilty of breach of contract. The contractor was ordered to pay $19,013 for the breach, plus pre-judgment interest assessed from February 2, 1999 to September 6, 2000 at the rate of 10%, amounting to $3,026.40. The court's

Final Order also stated that the defendant was liable for "incidental and consequential damages" in the amount of $2,853.23, which was the interest associated with the plaintiff's loan. Plaintiff's counsel was ordered to disburse $11,548 to the remaining creditor of Wills Electric, and to obtain a lien release before disbursing any funds to the plaintiff. Mirsaidi appealed.

## II. BREACH OF CONTRACT

Mr. Mirsaidi admitted at trial that two or three months earlier, Metro had paid him the full amount on the master contract, and he concedes on appeal that the plaintiff is accordingly entitled to receive the $19,013 owed, so the question of whether or not Mirsaidi breached the contract would merely be academic, were it not for his argument that he is not guilty of a breach, and therefore that he cannot be held responsible for any damages beyond the contract amount. Mr. Mirsaidi continues to insist that Mr. Wills breached the contract by failing to pay off his suppliers and obtain releases from them. He also argues that the subcontractor has unclean hands, and that it would be inequitable to reward him in any way for the difficulties that he himself created.

We note that there is nothing in the text of the contract which makes payment of the contract amount conditional upon payment to suppliers or upon release of liens. Mr. Mirsaidi alleges that the master contract made Metro's payment to him contingent upon such releases, but the subcontracting agreement does not incorporate the terms of the master contract either expressly or by reference. The subcontract does contain a payment provision, which reads as follows:

> ". . . [t]he said Contractor agrees that he will pay to the said Sub-Contractor the sum of Ninety seven thousand three hundred and 00/100 ($97,300) Dollars. Payment will be made as follows: Sub-Contractor will turn in his invoice minus 10% retainage for progress payment by 25th day of each month for examination by architect and contractor, after approval of the invoice by said architect, the invoice will be sent to the owner for payment. Three (3) days after the Contractor received (sic) his payment, the Sub-Contractor will receive his check. (The procedure will apply for retainage money)."

It appears to us that the only contingency contained in this provision is the approval of the work by the architect and the contractor, and the proof showed that they both gave their approval to the completed job. We do not believe the language about payment to the sub-contractor three days after the contractor is paid constitutes a condition precedent to the contractor's obligation to pay. We construe it rather as part of a procedure designed to promote an orderly and predictable transfer of funds from the client to the ultimate payee.

It is axiomatic that in contract formation the parties are free to allocate risks and burdens as they see fit. *Brown Bros., Inc. v. Metropolitan Government of Nashville and Davidson County*, 877 S.W.2d 745 (Tenn. Ct. App. 1993); *Empress Health and Beauty Spa, Inc., v. Turner,* 503 S.W.2d 188 (Tenn. 1973). Thus, the parties could have included a clause making the final payment on their

contract contingent upon receipt of lien releases from all the suppliers the subcontractor dealt with. This was not done, so there can be no doubt that Mirsaidi breached the contract at issue.

### III. PRE-JUDGMENT INTEREST

It has long been the law in Tennessee that pre-judgment interest is allowable when based upon equitable principles. *See Fisher v. Klipstatter,* 689 S.W.2d 870 (Tenn. Ct. App 1985). The common-law rule has been codified at Tenn. Code Ann. § 47-14-123 (1995), which permits courts or juries to award prejudgment interest as damages "in accordance with the principles of equity at any rate not in excess of a maximum effective rate of ten percent (10%) per annum."

Such an award is discretionary with the court if the claim involved is for non-liquidated damages. *Myint v. Allstate Ins. Co.*, 970 S.W.2d 920 (Tenn. 1998); *Howard G. Lewis Construction Co., v. Lee*, 830 S.W.2d 60 (Tenn. Ct. App. 1991); *B.F. Myers & Son v. Evans*, 612 S.W.2d 912 (Tenn. Ct. App. 1980). However, when the claim is for failure to make timely payment on a contract amount, and there is no dispute as to the amount due, pre-judgment interest is considered a matter of right. *See* Tenn. Code. Ann. § 47-15-109; *Jaffe v. Bolton*, 817 S.W.2d 19 (Tenn. Ct. App. 1991); *Performance Systems, Inc. v. First American National Bank,* 554 S.W.2d 616 (Tenn. 1977). It is presumed in such cases that equity requires that the plaintiff be compensated for the loss of use of money he was entitled to collect under the contract.

Although there may be some cases where it is inequitable to award pre-judgment interest when an obligor has failed to make timely payment under a contract, this does not appear to be such a case. There was no evidence presented at trial of inequitable conduct on the part of Wills. There was, however, some proof that Mirsaidi had told one of Wills' suppliers that Wills had already been paid in full on the library contract when that was not the case, in order to increase the pressure on the subcontractor. The award of pre-judgment interest is affirmed.

### IV. CONSEQUENTIAL DAMAGES

Although the trial court's judgment denominated the damages suffered by the plaintiff as "incidental and consequential," these terms are not synonymous. In fact, they refer to two distinct forms of damages, for the recovery of which very different standards apply. Incidental damages are a type of general damages – that is, those damages "which the law itself implies or presumes [to be] the immediate, direct or proximate result, or such as necessarily results from the injury, without reference to the special character, condition or circumstances of the plaintiff." *Black's Law Dictionary* (6th ed. 1990).

Consequential or "special" damages are defined in *Black's* as "[s]uch damage as does not flow directly and immediately from the act of the party, but only from some of the consequences or results of such act." The rule from the venerable and familiar case of *Hadley v. Baxendale*, 9 Ex. 341, 156 Eng. Rep. 145 (1854) states that consequential damages will only be awarded if they could reasonably be supposed to have been within the contemplation of the parties at the time of

contracting, as a probable consequence of a breach of contract. The *Baxendale* rule has been seconded many times by our Tennessee courts. *See, for example*, *Lane v. Associated Housing Developers,* 767 S.W.2d 640 (Tenn. Ct. App. 1988); *Turner v. Benson*, 672 S.W.2d 752 (Tenn. 1984).

Several Tennessee cases have stated that our courts may allow recovery of all damages which are the normal and foreseeable results of a breach of contract. *Moore Construction Co. v. Clarksville Dept. of Electricity*, 707 S.W.2d 1 (Tenn. Ct. App. 1985); *Bush v. Cathey*, 598 S.W.2d 777 (Tenn. Ct. App. 1979); *Wilson v. Dealy*, 434 S.W.2d 835 (Tenn. 1968). Such results would include both incidental damages and those consequential damages that meet the *Baxendale* test. For purposes of analysis, to say that certain results were foreseeable at the time of contracting, or that they could reasonably be supposed to have been within the contemplation of the parties would seem to be functionally equivalent.

In the present case, there is no evidence that at the time of contracting Mr. Mirsaidi knew or suspected that failure on his part to make timely and complete payment to Wills would force the subcontractor to borrow money to keep his company afloat. It is clear that after contracting Mirsaidi became aware that Wills faced some financial difficulties. For example, Braid Electric, which was the prime supplier on the subcontract would not extend credit to Wills because the company was too new, so Mirsaidi had to purchase the necessary supplies on his own credit. But such after-acquired knowledge cannot be used to prove that at the time of contracting Mirsaidi could have foreseen the consequences of his failure to make timely payment on the contract.

Also, as we stated above, the award of pre-judgment interest was meant to compensate Wills for the loss of use of the money to which he was entitled. An additional award for interest on money borrowed would appear to compensate the plaintiff twice for a single injury. In light of this circumstance, and of the rule in *Baxendale*, we reverse the award of consequential damages.

## IV.

The judgment of the trial court is affirmed in regard to payment on the contract amount and pre-judgment interest, but reversed in regard to consequential damages. Remand this cause to the Chancery Court of Davidson County for further proceedings consistent with this opinion. Tax the costs on appeal equally between the appellant and the appellee.

_____
BEN H. CANTRELL, PRESIDING JUDGE, M.S.